UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------X

KEVIN HUGER,

                   Petitioner,            **MEMORANDUM & ORDER**

    - against –                20-cv-1196 (KAM)

E. BELL,

                  Respondent.

----------------------------------------X

**MATSUMOTO, United States District Judge:**

       *Pro se* Petitioner Kevin Huger ("Petitioner") is incarcerated pursuant to a judgment of the Supreme Court, Kings County, convicting him of kidnapping in the second degree (N.Y. Penal Law § 135.20) and menacing in the third degree (N.Y. Penal Law § 120.15). (*See* ECF No. 1, Petition for Writ of Habeas Corpus ("Pet."), at 1.) Petitioner filed this action on February 28, 2020, seeking habeas relief pursuant to 28 U.S.C. § 2254. (*See id.*) For the reasons set forth below, Mr. Huger's petition is respectfully DENIED.

## BACKGROUND

### I.    Facts

On March 11, 2010, at approximately 4:30 p.m., Petitioner went to Jalesa Rivers's home in Brooklyn to retrieve his belongings.  (Trial Tr. at 69–71.)[1]  Rivers had ended their year-and-a-half-long relationship the day before.  (*Id.* at 61, 64.)

When Petitioner arrived, he and Rivers went upstairs to speak privately.  (*Id.* at 70-72.)  Petitioner asked Rivers if she and a man named Carl Ramah, a childhood friend of Rivers, were dating.  (*Id.* at 72, 276.)  At some point during the conversation, Ramah stopped by Rivers's house.  (*Id.* at 72–73.)

At trial, the jury was presented with two versions of events that took place during Ramah's visit.  According to Rivers's trial testimony, Ramah initially remained downstairs while Petitioner and Rivers continued to talk upstairs.  (*Id.* at 72–73.)  Rivers testified that she and Petitioner then began to argue because Petitioner accused her of cheating on him with Ramah.  (*Id.* at 73.)  Rivers further testified that Ramah and Rivers's mother, upon hearing their argument, came upstairs to see what was going on, at which point Petitioner threatened to kill Ramah, accusing

---

[1] Numbers in parentheses preceded by "Trial Tr." refers to pages of the Trial Transcript.  (ECF Nos. 8-1, 9, 10, 11, and 12, Trial Transcript.)  Numbers in parentheses preceded by "S.H. Tr." refers to pages of the transcript of the *Sandoval* hearing, dated June 26, 2012.  (ECF No. 8, *Sandoval* Hearing Transcript.)

Ramah of "l[ying] and disrespect[ing]" him. (*Id.* at 74.) Rivers testified that Petitioner eventually left, and Ramah also left about an hour thereafter. (*Id.* at 75–76.) Ramah, on the other hand, testified that he was at Rivers's house for less than five minutes and that he did not hear any argument between Rivers and Petitioner. (*Id.* at 324–27.)

About two hours after leaving Rivers's house, Petitioner called Rivers and asked her to come outside to talk, and Rivers agreed. (*Id.* at 77.) Approximately ten minutes later, Petitioner arrived outside of Rivers's house with his friend, Kevin Williams, in Williams's blue SUV with tinted windows. (*Id.* at 65–66; 77–78; 125.) Petitioner was sitting in the front passenger seat and Williams was driving. (*Id.* at 78–79.) Rivers got into the back of the vehicle, and Williams drove away. (*Id.*)

As they were driving around, Petitioner told Rivers that she had "one chance to explain [her]self." (*Id.* at 79.) Rivers told Petitioner that she had not lied to him nor cheated on him with Ramah, but Petitioner did not believe Rivers. (*Id.*) Williams then stopped the car and Petitioner stepped out to get in the back with Rivers. (*Id.*) Petitioner grabbed Rivers by the neck, choked her, and told her that he was going to kill her. (*Id.* at 79–80.) At that point, Williams handed Petitioner a sock, from which Petitioner pulled out a silver gun. (*Id.* at 80–81.) Petitioner,

while holding the gun, threatened to kill Rivers and dump her body in Prospect Park.  (*Id.* at 81.)

While Rivers was still riding in the SUV with Petitioner and Williams, Ramah called her to ask if he could pick up his jacket that he had left at her house.  (*Id.* at 82.)  Rivers told Ramah that he could get it later and hung up the phone.  (*Id.*)  Petitioner then instructed Rivers to call Ramah back and tell him to come pick up his jacket, and Rivers complied.[2]  (*Id.* at 150–51.)  Williams drove them back to Rivers's house, where the three waited outside for Ramah to arrive.  (*Id.* at 84.)

When Ramah approached the house, Petitioner walked up to him, grabbed him by the shirt, and told him, "we're going to go for a ride."  (*Id.* at 283–84.)  Ramah resisted, and Petitioner pulled out the silver gun from his pocket, put the gun against Ramah's head, and began to drag Ramah across the street towards the SUV, at which point Rivers ran into her house to call 911.  (*Id.* at 284-86.)  Once he had dragged Ramah to the SUV, Petitioner opened a rear passenger door.  (*Id.* at 286–87.)  Ramah continued to struggle to break free, and Petitioner struck him on the back of the head with the gun, knocking him unconscious.  (*Id.*)

---

[2] Rivers testified on direct that she called Ramah back, per Petitioner's instruction.  (*Id.* at 83.)  However, on cross, upon being shown the written statement she made at the police precinct later that day, Rivers testified that it was in fact Petitioner who called Ramah back and told him to come pick up his jacket at Rivers's house.  (*Id.* at 148–50.)  Ramah testified, both on direct and cross, that it was Rivers who called him back.  (*Id.* at 281–82; 327–28.)

4

When Ramah came to, he was in the back of the SUV next to Petitioner. (*Id.* at 287–88.) Petitioner told Ramah that he "messed up" and "need[ed] to pay for what [he] did." (*Id.* at 289.) Petitioner continued to threaten Ramah, telling him he was "not going home tonight" and that his body would be dumped in Prospect Park. (*Id.* at 290.) Petitioner also hit Ramah four or five times in the face, neck, and chest. (*Id.* at 290-92.) After about twenty minutes, Petitioner told Ramah that he would let Ramah go, and Williams drove them back to Rivers's house. (*Id.* at 291-92.) Williams parked the SUV at the intersection of Lott Avenue and Rockaway Avenue, approximately one block from Rivers's house. (*Id.* at 292-93.) Petitioner then called Rivers to tell her to meet them where they were parked.[3] (*Id.*)

Meanwhile, at approximately 8:00 p.m., Sergeant Florencio Arquer and Police Officers Martinez and Shook reported to Rivers's house in response to 911 calls. (*Id.* at 200-01, 363-64.) As Rivers was speaking with Sergeant Arquer, Petitioner called Rivers and asked her to meet him at the intersection of Rockaway Avenue and Livonia Avenue by the train station. (*Id.* at

---

[3] Rivers testified on direct and cross that it was Petitioner who called to tell her where to pick up Ramah. (*Id.* at 95–98; 172.) Ramah testified on direct that he called Rivers and told her to meet them at Lott and Rockaway. (*Id.* at 292–93.) On cross, Ramah initially testified that while he was riding in the SUV with Petitioner and Williams, Petitioner did not call Rivers. However, upon his memory being refreshed with the transcript of his grand jury testimony, Ramah testified that it was Petitioner who called Rivers to tell her to meet them. (*Id.* at 341–42.)

95–96; 202–04.)   Rivers passed this information on to Sergeant Arquer.  (*Id.*)  Sergeant Arquer and other officers, along with Rivers, canvassed for about half an hour the vicinity of Rockaway and Livonia and Rivers's house in unmarked cars, looking for the SUV.  (*Id.* at 204–08, 399–401.)   After the search proved unsuccessful, Sergeant Arquer decided to have Rivers call Petitioner and meet with him, while Officers Martinez and Montas trailed her on foot.  (*Id.* at 205–09.)  Sergeant Arquer instructed Rivers to not enter the vehicle, no matter what happens, and dropped her off.  (*Id.* at 98; 209–11.)  After retrieving Ramah's jacket from her house, Rivers walked towards the corner of Lott and Rockaway Avenues, where the SUV was parked.  (*Id.* at 98–99; 211.)

At first, Rivers stood outside the SUV, talking to Petitioner, who was still sitting in the back with Ramah, through an open window.  (*Id.* at 102; 211–12; 343.)  Petitioner told Rivers to get in the car, so she got into the front passenger seat and Williams drove off.  (*Id.* at 102–03; 174–75.)  Officer Montas informed Sergeant Arquer of what had happened, and Sergeant Arquer immediately drove towards the intersection of Rockaway and Lott Avenues.  (*Id.* at 212–13.)  Sergeant Arquer saw the SUV stopped at a red light and effectuated a car stop.  (*Id.* at 213–14.)  After Williams pulled over, all four occupants of the SUV were taken out of the car and detained.  (*Id.* at 175–77, 213–18, 295–96.)  Officer

Gonzalez searched the SUV and found the gun, which was loaded with five rounds, under the front passenger seat.  (*Id.* at 403–05.) Rivers, Ramah, Williams, and Petitioner were arrested and taken to the 73rd Precinct.  (*Id.* at 296–97.)

## II.  The Trial

Petitioner was charged, on an acting in concert theory, under Kings County Indictment Number 2177/2010, with kidnapping in the second degree (N.Y. Penal Law § 135.20), unlawful imprisonment in the second degree (N.Y. Penal Law § 135.05), criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03(3)), two counts of menacing in the second degree (N.Y. Penal Law § 120.14(1)), two counts of menacing in the third degree (N.Y. Penal Law § 120.15), criminal possession of a weapon in the fourth degree (N.Y. Penal Law § 265.01(1)), criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02(1)), and unlawful possession of marijuana (N.Y. Penal Law § 221.05).  (*See* ECF No. 13-1, Respondent's Habeas Exhibit D, at 5–6.)[4]

### A.  Petitioner's N.Y. Crim. Proc. Law § 30.30 Motion

On September 6, 2011, Petitioner filed a motion to dismiss the indictment under New York Crim. Proc. Law § 30.30 ("§ 30.30 motion"), asserting that the State should be charged with: (1) the 61 days from his arraignment on March 13, 2010 to when the

---

[4] For ease of reference, the page numbers used in citations to Respondent's Exhibits follow ECF pagination.

State filed their statement for readiness for trial on May 13, 2010; and (2) the 171 days from March 8, 2011, the date the State moved to obtain a buccal swab sample from Petitioner, to August 26, 2011 when the test result comparing Petitioner's DNA to the DNA from the firearm found at the time of Petitioner's arrest became available. (*See* ECF No. 13-3, Respondent's Habeas Exhibit F ("Resp't Exhibit F"), at 66–68.)   In his motion, Petitioner argued that the State had inexcusably waited for more than nine months after declaring it was ready for trial to obtain his DNA sample. (*Id.*)

The State opposed the § 30.30 motion by arguing that there was no delay in filing the motion for the buccal swab sample because the State had been waiting on test results from the Office of the Chief Medical Examiner ("OCME") that would determine whether there was sufficient DNA on the firearm to be compared against Petitioner's DNA. (*Id.* at 84.)   According to the State, it "did not receive the results from OCME until March 2011." (*Id.*)

The trial court denied Petitioner's motion to dismiss the indictment, having found that only the 61 days from March 13 to May 13, 2010 were "includable time." (*Id.* at 104.)   As to the 171 days Petitioner argued should also be charged to the State, the court, relying on the representations made by the People in their opposition papers, held that "there was nothing to suggest that the People delayed requesting DNA testing; rather, it appears

8

that the People had to wait until a DNA profile was generated by OCME . . . ." (*Id.* at 103.)

### B. *Sandoval* Hearing

Before trial, Petitioner requested a *Sandoval* hearing, seeking an order barring the prosecution from cross-examining Petitioner about his prior convictions should he testify at trial. (S.H. Tr. at 8.)  Specifically, Petitioner sought to prevent the prosecution from referring to his six prior convictions in New York, including a 2009 conviction for possession of marijuana, a 1996 conviction for attempted criminal possession of a weapon in the third degree, a conviction for criminal possession of a controlled substance in the seventh degree, a 1988 conviction for attempted first-degree robbery, a 1988 conviction for attempted second-degree robbery, and a conviction for second-degree robbery. (*Id.* at 8–15.)  Additionally, Petitioner sought to prevent the prosecution from introducing his three prior convictions in Virginia for grand larceny, obtaining money by false pretenses, and possession of a controlled substance. (*Id.*)

At the *Sandoval* hearing, held on July 26, 2012, defense counsel argued that Petitioner's prior convictions lack probative value and that a ruling by the trial court permitting the prosecution to cross-examine Petitioner on his prior convictions would be "highly prejudicial" and "tantamount to telling him [that he] can't testify in this particular case." (*Id.* at 16–17.)  The

9

court ruled that the prosecution may cross-examine Petitioner on his Virginia convictions for grand larceny and obtaining money by false pretenses because those are "crimes which go to credibility." (*Id.* at 17-18.)   However, the court prohibited the prosecution from inquiring about the underlying facts of those convictions. (*Id.*)   As for Petitioner's 1996 conviction for attempted criminal possession of a weapon in the third degree, the court permitted the prosecution to introduce both the conviction and its underlying facts, reasoning that "illegal possession of a handgun . . . clearly is an instance of placing one's own interest above that of society." (*Id.* at 18.)   Next, the court permitted the prosecution to inquire about Petitioner's 1988 convictions for attempted robbery in the first and second degrees because "robbery and attempted robbery are most salient crimes on the issue of credibility on the issue of placing one's own interest above that of society." (*Id.* at 19.)   However, the court only allowed the prosecution to inquire into the underlying facts of the first-degree attempted robbery conviction.   (*Id.* at 19—20.)   Finally, the court permitted inquiry into the conviction for second-degree robbery and its underlying facts.   (*Id.* at 20.)   The court precluded the prosecution from asking about Petitioner's convictions for possession of controlled substances. (*Id.* at 17-19.)

### C.   Jury Instructions and Verdict

Instructing the jury regarding the elements of kidnapping in the second degree, the trial court charged that the jury could find Petitioner guilty if it found, *inter alia*, that the prosecution had established beyond a reasonable doubt that "[Petitioner] restrained Carl Ramah with intent to prevent Carl Ramah's liberation either by secreting or holding him in a place where he was not likely to be found or by using or threatening to use deadly physical force."  (Trial Tr. at 658.)  At the end of the jury charge, the court asked counsel whether they had any exceptions or additional requests to the charge.  (Id. at 671.) Defense counsel answered that he had neither exceptions nor additional requests.  (*Id.*)

The jury found Petitioner guilty of kidnapping in the second degree and the count of menacing in the third degree pertaining to Ramah.  (*Id.* at 697.)  The jury found Petitioner not guilty of criminal possession of a weapon in the second degree and the count of menacing in the third degree pertaining to Rivers. (*Id.*)  Upon hearing the verdict, the court instructed the jury that "kidnapping in the second degree requires the use or threatened use of deadly physical force" and given the prosecution's argument that the use or threatened use of deadly physical force was "done by the way of the handgun, the revolver," "in order for [Petitioner] to be guilty of kidnapping in the second

degree, he would also have to be guilty of criminal possession of a weapon in the second degree because that's the only means of using or threatening to use deadly physical force . . . ." (*Id.* at 699–700.)  The court then subsequently clarified for the jury that because it had found Petitioner not guilty of the weapon possession charge, it could now only find Petitioner guilty of kidnapping in the second degree if it found that Petitioner had restrained Ramah "with intent to prevent his liberation by secreting him in a place where he was not likely to be found." (*Id.* at 705-06.)  Notably, defense counsel did not make any objections to these instructions. (*Id.* at 703.)  Thereafter, the jury again found Petitioner guilty of kidnapping in the second degree.  (*Id.* at 710.)

## III. State Post-Conviction Proceedings

### A. Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division, Second Department, arguing that: (1) the State failed to prove kidnapping in the second degree beyond a reasonable doubt because the evidence was not legally sufficient to establish that Petitioner restrained Ramah with intent to prevent his liberation by secreting or holding him in a place where he was not likely to be found; (2) his trial counsel was ineffective in failing to object to the court's instruction that the jury could still find Petitioner guilty of kidnapping in the second degree if

12

it found that Petitioner restrained Ramah with intent to prevent his liberation by secreting or holding him in a place where he was unlikely to be found; and (3) he was deprived of his due process right to a fair trial by the trial court's *Sandoval* ruling, which allowed the prosecution to introduce certain of Petitioner's prior convictions, as well as the underlying facts of some of them, should Petitioner choose to testify. (*See* ECF No. 13, Respondent's Habeas Exhibit C ("Resp't Exhibit C"), at 28–54.)

On February 16, 2016, the Appellate Division affirmed Petitioner's conviction. *People v. Huger*, 26 N.Y.S.3d 131 (2d Dep't 2016). The Appellate Division held that (1) Petitioner's first argument was not preserved and, in any event, the evidence was legally sufficient to establish his guilt of kidnapping in the second degree beyond a reasonable doubt; (2) Petitioner's trial counsel was not ineffective for the alleged failure to object to the court's instruction because "[t]he instruction given was not improper" and "[a] defendant is not denied effective assistance of counsel merely because counsel does not make a motion or argument that has little or no chance of success"; and (3) the trial court's *Sandoval* ruling was proper because the court weighed the probative value against the prejudicial effect for each of Petitioner's prior convictions, and Petitioner failed to demonstrate that exclusion was warranted because the prejudicial effect so outweighed the probative value. *Id.* at 132–33. On May 11, 2016, the New York

Court of Appeals denied Petitioner's leave to appeal. *People v. Huger*, 60 N.E.3d 1206 (N.Y. 2016).

### B. Petitioner's N.Y. Crim. Proc. Law § 440.10 Motion

On September 2, 2015, Petitioner filed a motion under New York Crim. Proc. Law § 440.10(1)(b) and (h) to vacate his judgment of conviction and dismiss the underlying indictment ("§ 440.10 motion"). (Resp't Exhibit F at 1—28.) Petitioner asserted that new information showed that the State had misrepresented material facts which the trial court had relied on in denying his § 30.30 motion. (*Id.* at 9—13.) Specifically, documents obtained by Petitioner's appellate counsel from the OCME and the Kings County District Attorney's Office pursuant to Freedom of Information Law requests demonstrated that, in contrast to the State's representation that it was not until March 2011 that it received test results from the OCME that the firearm contained a DNA sample suitable for comparison against Petitioner's DNA, in fact, the OCME had sent the test results to the State on May 12, 2010. (*Id.*) Therefore, Petitioner argued, the trial court should have charged additional 128 days—from April 20, 2011, when the buccal swab sample was taken from Petitioner, to August 26, 2011, when the DNA comparison result became available—to the State. (*Id.* at 26—27.) And because the total delay attributable to the State would have been 189 days, 128 days plus the 61 days the court found

chargeable to the State, Petitioner argued, the court should have granted his § 30.30 motion.  (*Id.* at 27.)

In response, the State, though conceding that the representation it had made to the court was incorrect, argued that the court's decision would have been the same.  (*See* ECF No. 13-4, Respondent's Habeas Exhibit G, at 10—11.)  Specifically, the State contended that the 37 days between July 20 to August 26, 2011 were excludable pursuant to New York Crim. Proc. Law § 30.30(4)(b), (d), and (f) because Petitioner's counsel and Williams' counsel did not appear in court on July 20, 2011 due to their engagement in other matters.  (*Id.*)  The State argued that it therefore was chargeable with at most 152 days, the 61 days from March 13 to May 13, 2010 and the 91 days from April 20 to July 20, 2011, below the statutory limitation period of 183 days.  (*Id.*)

By its Decision and Order, dated May 30, 2017, the trial court granted Petitioner's § 440.10 motion.  (*See* ECF No. 13-9, Respondent's Habeas Exhibit L, at 5—7.)  Thereafter, the State filed a motion to reargue, which was granted, and upon reargument, the court denied the § 440.10 motion, holding that the 37 days from July 20 to August 26 were excludable under New York Crim. Proc. Law § 30.30(4)(f) because time is excluded from the speedy trial calculation if defense counsel is not present, "almost without regard to the status of the People's state of (post)

readiness." (*See* ECF No. 13-9, Respondent's Habeas Exhibit O, at 1–2.)

Petitioner then sought leave to appeal the denial of his § 440.10 motion to the Appellate Division, which was granted. (*Id.* at ¶ 42.) On December 26, 2018, the Appellate Division affirmed the trial court's decision, holding that the exclusion provided by New York Crim. Proc. Law § 30.30(4)(f) "is applicable notwithstanding the People's own lack of readiness." *People v. Huger*, 91 N.Y.S.3d 161, 163 (2d Dep't 2018). Petitioner sought leave to appeal from the Appellate Division's decision, which was denied on March 21, 2019. *People v. Huger*, 123 N.E.3d 865 (N.Y. 2019). Defendant then submitted a letter requesting reconsideration of his application for leave to appeal, which was once again denied on May 31, 2019. *People v. Huger*, 126 N.E.3d 155 (N.Y. 2019).

## IV. **The Instant Petition**

On February 25, 2020, Petitioner filed the instant application seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See generally* Pet.) Petitioner raises the same claims from his direct appeal and § 440.10 motion. (*Id.*) On April 22, 2020, Respondent submitted his memorandum of law in opposition and the exhibits attached thereto. (*See* ECF Nos. 7–13-15.)

16

**STANDARD OF REVIEW**

A writ of habeas corpus filed by an individual in state custody is governed by, *inter alia*, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Section 2254 of AEDPA provides that a district court shall issue a writ of habeas corpus for a petitioner in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Section 2244 provides that a one-year statute of limitations applies to "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C. § 2244(d)(1); *see generally* 28 U.S.C. § 2244(d).

A district court shall not grant a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State," "there is an absence of available State corrective process," or "circumstances exist that render [such State corrective] process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(A), (B).  Even if a petitioner has not exhausted all state remedies, a district court may deny his application for a writ of habeas corpus on the merits.  28 U.S.C. § 2254(b)(2).

A district court may grant a writ of habeas corpus for claims that were adjudicated on the merits in state court and the adjudication produced a decision that was "contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (alteration in original) (citing 28 U.S.C. § 2254(d)(1)); *see also Reznikov v. David*, Nos. 05-cv-1006, 05-cv-1008(RRM), 2009 WL 424742, at *3 (E.D.N.Y. Feb. 20, 2009) ("Under AEDPA, a proper merits adjudication requires only that (a) a federal claim be raised, and (b) that it be disposed of on substantive, rather than procedural grounds."). "When a state court [adjudicates a federal claim on the merits], a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan*, 261 F.3d at 312.

Clearly established federal law refers to the holdings of the Supreme Court's decisions at the time of the relevant state court decision. *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (citation omitted). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are analyzed independently. *Stultz v. Artus*, No. 04-cv-3170(RRM), 2013 WL 937830, at *5 (E.D.N.Y. Mar. 8, 2013). A state court's decision is contrary to

federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (O'Connor, J., concurring and writing for the majority in this part).  An unreasonable application of law occurs when "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  A district court "may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (per curiam) (citation and internal quotation marks omitted).  If a district court determines a state court's application of law was unreasonable, "it must next consider whether such error was harmless." *Stultz*, 2013 WL 937830, at *5 (citation and internal quotation marks omitted).

Apart from a state court's decision contrary to or unreasonable application of federal law, a district court may grant a writ of habeas corpus when the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

2254(d)(2). State court determinations of facts are presumed correct, however, and the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In the instant action, Petitioner is proceeding *pro se.* A *pro se* petitioner's pleadings are held to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation and internal quotation marks omitted), and are construed "to raise the strongest arguments that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). "Nonetheless, a *pro se* [litigant] is not exempt from compliance with relevant rules of procedural and substantive law." *Rivera v. United States*, No. 06-cv-5140(SJF), 2006 WL 3337511, at *1 (E.D.N.Y. Oct. 4, 2006) (citing *Faretta v. California*, 422 U.S. 806, 834 n.36 (1975)). The instant petition is evaluated accordingly.

<u>**DISCUSSION**</u>

**I.  Sufficiency of the Evidence**

First, Petitioner argues that the evidence at trial was not legally sufficient to establish his guilt of kidnapping in the second degree beyond a reasonable doubt because the prosecution failed to prove that Petitioner intended to prevent Ramah's liberation by secreting or holding him in a place where he was not likely to be found.

As an initial matter, the Court finds that this claim is not reviewable because it is procedurally barred. Federal courts lack authority to review a state court decision that rests on "independent and adequate" state law grounds. *Lee v. Kemna*, 534 U.S. 362, 375 (2002). This rule applies equally regardless of whether the state law ground is substantive or procedural. *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). On direct appeal, the Appellate Division affirmed Petitioner's conviction and held that "[t]he defendant's contention that the evidence was legally insufficient to support his conviction of kidnapping in the second degree is unpreserved for appellate review." *Huger*, 26 N.Y.S.3d at 132.

Thus, the state law ground on which the Appellate Division denied Petitioner's claim was a violation of New York's preservation rule, which requires a contemporaneous objection to any alleged legal error by defense counsel at a criminal trial. N.Y. Crim. Proc. Law § 470.05(2). New York's preservation rule suffices as an independent state law ground, *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007), but the remaining issue is whether it is "adequate" to prevent federal collateral review. *Id.* at 218. A state preservation rule is "only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state," but "even firmly established and regularly followed state rules will

21

not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" *Garvey v. Duncan*, 485 F.3d 709, 713—14 (2d Cir. 2007) (citation omitted).

The Second Circuit has found New York's contemporaneous objection rule to be firmly established and regularly followed by New York courts. *Garcia v. Lewis*, 188 F.3d 71, 78—79 (1999). *See also Yara v. Ercole*, 558 F. Supp. 2d 329, 336 (E.D.N.Y. 2008); *Dozier v. McGinnis*, 558 F. Supp. 2d 340, 349 (E.D.N.Y. 2008). Therefore, whether the Petitioner's legal sufficiency claim is procedurally barred by § 470.05(2) turns on whether it would be exorbitant to apply the rule in the instant case. The Court looks to the guideposts provided by the United States Supreme Court in *Lee*, 534 U.S. at 381-85, to help federal courts determine whether the application of a firmly established and regularly followed state preservation rule would be exorbitant:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;
>
> (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and
>
> (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 381-85).

Turning to the first *Lee* factor, the trial court could not have relied on Petitioner's violation of the contemporaneous objection rule because such a violation, by definition, cannot occur until a party attempts to raise an unpreserved argument on appeal.  The question remains, however, whether perfect compliance with the rule might have changed the trial court's decision.  The Court finds that the trial court likely would not have changed its decision even if Petitioner had timely objected and argued that the verdict did not possess sufficient evidence to support kidnapping in the second degree beyond a reasonable doubt because the prosecution failed to prove that he intended to prevent Ramah's liberation by secreting or holding him in a place where he was not likely to be found.  Nevertheless, unlike in *Lee*, where even perfect adherence to the relevant procedural rule would not have convinced the trial judge to grant a continuance because the judge had stated that personal obligations and another scheduled trial prevented him from doing so, 534 U.S. at 381, because it is conceivable that perfect compliance with the preservation rule might have affected the ultimate outcome here, the first *Lee* factor does not give Petitioner support for finding that applying the rule would be exorbitant.

Under the second *Lee* factor, the Court considers New York law and finds that the contemporaneous objection rule is firmly established and regularly followed in the particular circumstances of Petitioner's case, i.e., where defense counsel timely moved for a trial order of dismissal for a different offense but not the offense at issue on appeal. It is well-established that New York courts will not review unpreserved claims of legal insufficiency. *People v. Gray*, 652 N.E.2d 919, 921 (N.Y. 1995). *See also People v. Oguntunji*, 988 N.Y.S.2d 901, 901 (2d Dep't 2014) ("The defendant's challenge to the legal sufficiency of the evidence supporting his conviction for robbery in the third degree is unpreserved for appellate review, as the defendant never moved for a trial order of dismissal of that count . . . ."). Thus, the second *Lee* factor likewise provides no support for finding that applying the contemporaneous objection rule would be exorbitant.

The final and "most important" consideration noted by the Supreme Court in *Lee* asks whether Petitioner "substantially complied" with § 470.05(2) given the realities of trial. 534 U.S. at 382. Where, as here, a defendant makes no objection to the legal sufficiency of the evidence supporting a charge during trial but makes a sufficiency challenge later on appeal, that defendant cannot be said to have substantially complied with § 470.05(2). Accordingly, the factors from *Lee* provide no support for finding the Appellate Division's application of the contemporaneous

objection rule exorbitant.  The Court holds that New York's preservation rule constituted an adequate ground of decision independent of Petitioner's federal claim and Petitioner's sufficiency of the evidence claim is therefore procedurally barred.

Even if the claim was not procedurally barred, it would still be denied because there was sufficient evidence to support Petitioner's guilt of kidnapping in the second degree.  Habeas relief is warranted on a sufficiency of the evidence claim only if, viewing the evidence in the light most favorable to the State, "no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).  Under this "rigorous standard," "all possible inferences that may be drawn from the evidence must be construed in the prosecution's favor." *Smith v. Lee*, No. 12-cv-6215(PGG), 2015 WL 5011422, at *12 (S.D.N.Y. Aug. 21, 2015) (citations omitted).  To evaluate this claim, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under New York law, a person commits kidnapping in the second degree when he or she "restrain[s] a person with intent to prevent his liberation by . . . secreting or holding him in a place

where he is not likely to be found." N.Y. Pen. Law §§ 135.20, 135.00(2). Here, construing the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences therefrom, a rational jury could have concluded that Petitioner restrained Ramah with the intent to prevent his liberation by "secreting or holding him in a place where he [was] not likely to be found," in violation of New York Penal Law § 135.20. Specifically, a rational jury could have credited the trial testimonies of Rivers and Ramah that Petitioner, acting in concert with Williams, forced Ramah, against his will, into a place where he was not likely to be found, the back seat of an SUV with tinted windows that was moving through the streets of Brooklyn. *See People v. Barnette*, 55 N.Y.S.3d 364, 364 (2d Dep't 2017) (finding the evidence was legally sufficient to support a second-degree kidnapping conviction where defendant "restrained the complainant with intent to prevent her liberation by secreting her in a place where she was unlikely to be found, i.e., a car with tinted windows traveling through Brooklyn"); *People v. Cole*, 33 N.Y.S.3d 466, 466 (2d Dep't 2016) (same). Therefore, the Court finds that a rational jury could have found proof of guilt beyond a reasonable doubt based on the evidence adduced at trial.

## III.   Ineffective Assistance of Counsel

Next, the Court turns to Petitioner's argument that his trial counsel was ineffective for failing to object to the trial court's instruction that the jury could convict Petitioner of kidnapping in the second degree if it found, beyond a reasonable doubt, that Petitioner restrained Ramah "with intent to prevent his liberation by secreting him in a place where he was not likely to be found." (Trial Tr. at 705-06.)

Under the Sixth Amendment, a criminal defendant is afforded "the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI.  This right does not guarantee a defendant "perfect counsel," but rather, "*effective assistance of counsel*." *Constant v. Martuscello*, 119 F. Supp. 3d 87, 142 (E.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Burt v. Titlow*, 571 U.S. 12, 24 (2013); *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

To establish a claim of ineffective assistance of counsel, a petitioner must satisfy the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687–96 (1984).  A petitioner must show that: (1) counsel's performance was deficient, meaning that it "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 688, 694.  A court assessing an ineffective assistance claim is not required "to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.

"Reasonableness" under the first prong is measured by the "prevailing professional norms."  *Id.* at 688.  Generally, "there is a strong presumption that counsel's actions 'might be considered sound trial strategy.'"  *Stultz*, 2013 WL 937830, at *7 (quoting *Strickland*, 466 U.S. at 688-89).  And "the fact that counsel is prepared and familiar with the relevant facts and legal principles is usually sufficient to defeat a claim that trial counsel was ineffective."  *Brown v. Phillips*, No. 03-cv-0361(DGT), 2006 WL 656973, at *8 (E.D.N.Y. Mar. 12, 2006) (internal quotation marks omitted) (quoting *Farrington v. Senkowski*, 19 F. Supp. 2d 176, 179 (S.D.N.Y. 1998)).  Under the second prong, prejudice, a "reasonable probability" is one "sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury," *id.* at 695, and the petitioner must "affirmatively prove prejudice arising from counsel's allegedly deficient representation," *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) (citations and internal quotation marks omitted).

"[T]he standard for judging counsel's representation is a most deferential one."  *Harrington v. Richter*, 562 U.S. 86, 105

(2011).  Due to the heightened deference under AEDPA, "[a] federal court reviewing a state court's determination regarding ineffective assistance of counsel has been characterized as 'doubly' deferential by the Supreme Court." *Constant*, 119 F. Supp. 3d at 143 (quoting *Harrington*, 562 U.S. at 105).  Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable" but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Here, Petitioner argues that his trial counsel was ineffective for failing to object to the instructions the trial court gave the jury on kidnapping in the second degree after the jury had acquitted him of the weapon possession charge, because those instructions "chang[ed] the theory in the indictment." (Pet. at 6-7.)  Generally, a defendant's counsel's failure to object to a jury instruction is unreasonably deficient performance "only when the trial court's instruction contained 'clear and previously identified errors.'" *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (quoting *Bloomer v. United States*, 162 F.3d 187, 193 (2d Cir. 1998)).  "[W]hen a trial court's instruction is legally correct as given," counsel's failure to object "does not constitute deficient performance." *Id.* (quoting *United States v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996)).  Based on the record, the Court finds

that the indictment[5] and the bill of particulars did not limit the State's theory on kidnapping in the second degree to Petitioner's use or threatened use of deadly physical force. (*See* ECF No. 7, Respondent's Memorandum of Law, at 12.) *See also People v. Vasquez*, 73 N.Y.S.3d 449, 450 (2d Dep't 2018) ("Where the prosecution is limited by the indictment or bill of particulars to a certain theory or theories, the court must hold the prosecution to such narrower theory or theories") (citing *People v. Grega*, 531 N.E.2d 279, 282 (N.Y. 1988)). Therefore, the trial court properly instructed the jury on the alternative of finding intent to restrain by secreting or holding Ramah in a place where he was not likely to be found, and because the instructions were proper, the trial counsel's performance was not deficient for failing to object and Petitioner was not prejudiced by such lack of objection. Accordingly, Petitioner's ineffective assistance of counsel claim is denied.

## IV.   Petitioner's *Sandoval* Claim

Petitioner argues that he was deprived of his due process right to a fair trial by the trial court's *Sandoval* ruling, which allowed the prosecution to introduce certain of Petitioner's prior convictions, as well as the underlying facts of some of them,

---

[5] Notably, Petitioner conceded in his opening brief on direct appeal before the Appellate Division that the indictment did not specify any particular theory as to kidnapping in the second degree. (Resp't Exhibit C at 36 ("As charged in the indictment, the second-degree kidnapping count alleged only that [Petitioner] 'abducted Carl Ramah' (Indictment).").)

should Petitioner choose to testify.  Petitioner alleges that he did not testify as a result of the *Sandoval* ruling.

"Federal review of a state court conviction is limited to errors of constitutional magnitude which denied a criminal defendant the right to a fundamentally fair trial." *Jenkins v. Bara*, 663 F. Supp. 891, 899 (E.D.N.Y. 1987) (citations omitted). Generally, "erroneous evidentiary rulings of a state trial court do not rise to the level of a constitutional deprivation upon which a writ of habeas corpus may be issued," *id.* (citations omitted), and a *Sandoval* decision is considered an evidentiary ruling. *Ayala v. Ercole*, No. 06-cv-1747(JFB), 2007 WL 1135560, at *14 (E.D.N.Y. Apr. 17, 2007).  Thus, erroneous *Sandoval* rulings do not usually provide grounds for granting a habeas petition, unless the ruling denied the defendant a fair trial or violated "'fundamental conceptions of justice.'" *Gouvatsos v. Ercole*, No. 08-cv-2049(SJF), 2010 WL 5173569, at *13 (E.D.N.Y. Dec. 13, 2010) (quoting *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998)); *see also Ayala,* 2007 WL 1135560, at *14.  Therefore, regardless of whether the trial judge erred in allowing the admission of the Petitioner's prior convictions, Petitioner's *Sandoval* claim is only cognizable under federal habeas review if such admission denied Petitioner a fair trial.

The United States Supreme Court established that "to raise and preserve for review the claim of improper impeachment

31

with a prior conviction, a defendant must testify." *Luce v. United States*, 469 U.S. 38, 43 (1984).  In *Luce*, the Supreme Court explained that when a defendant does not testify, "[a]ny possible harm flowing from a district court's *in limine* ruling is wholly speculative." *Id.* at 41.  Although *Luce* involved review of an *in limine* ruling by a federal trial court pursuant to Rule 609 of the Federal Rules of Evidence, "the *Luce* rationale is equally applicable" a federal court's collateral review of a state trial court's *Sandoval* ruling. *Carroll v. Hoke*, 695 F. Supp. 1435, 1440 (E.D.N.Y. 1988).  This is because "both procedures involve a pre-trial hearing on the admissibility of a defendant's prior convictions for impeachment purposes, and both procedures involve a weighing of the prejudicial impact of the convictions against the interest in impeachment of testimony." *Nieves-Delgado v. New York*, No. 00-cv-1397(LTS), 2003 WL 21310815, at *2 (S.D.N.Y. June 9, 2003).  Thus, the Second Circuit has "created a bright line rule . . . barring habeas relief for allegedly erroneous *Sandoval* rulings where a defendant elects not [to] testify." *Shannon v. Senkowski*, No. 00-cv-2865(NRB), 2000 WL 1683448, at *6 (S.D.N.Y. Nov. 9, 2000)).

Here, Petitioner's decision not to testify is fatal, because without his testimony, the impact of the trial court's *Sandoval* ruling is purely speculative. *See Luce*, 469 U.S. at 41. Accordingly, the trial court's *Sandoval* ruling did not deprive

Petitioner of a fundamentally fair trial, and his claim on this point is not cognizable on federal habeas review.

## V.   Speedy Trial Claim

Finally, Petitioner argues that the state court improperly denied his § 30.30 motion.  The AEDPA permits federal habeas review of state court adjudications only where a "violation of the Constitution or law or treaties of the United States" has occurred.  28 U.S.C. § 2254(a).  A federal habeas court may not grant habeas relief based on state courts' errors of state law, because "it is not the province of a federal habeas court to reexamine state court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 63 (1991).  Therefore, Petitioner's claim that his § 30.30 motion should have been granted is not cognizable on habeas review because it is based on an issue of pure state law.

## CONCLUSION

For the foregoing reasons, the instant petition for a writ of habeas corpus is denied and dismissed.  The Clerk of Court is respectfully requested to serve a copy of this Memorandum and Order on *pro se* Petitioner, note service on the docket, and close the case.

The Court certifies pursuant to 28 U.S.C. 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for purposes of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

Dated:   January 5, 2022
         Brooklyn, New York

                                   /s/
                    _____
                    **KIYO A. MATSUMOTO**
                    United States District Judge